IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| VINCENT T. TAYLOR AND ASSOCIATES, INC.; and VINCENT T. TAYLOR, an individual,<br><br><br>Plaintiffs,<br><br><br><br>v.<br><br><br>MANAGEMENT AND TRAINING CORPORATION,<br><br>Defendant. | **ORDER AND MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br><br>Case No. 2:22-cv-527-TC<br><br>Judge Tena Campbell |

Defendant Management and Training Corporation ("MTC") brings a motion to dismiss eight of the ten claims asserted against it by Plaintiffs Vincent T. Taylor and Associates, Inc., and Vincent T. Taylor (collectively, "VTA").[1]  Specifically, MTC moves to dismiss VTA's First, Second, Third, Fourth, Fifth (in part), Seventh, Eighth, and Ninth causes of action.  MTC has not moved to dismiss VTA's causes of action for breach of the implied covenant of good faith and fair dealing and for declaratory relief.  The court held a hearing on the motion on March 1, 2023. For the following reasons, the court grants the Defendant's motion in part and denies the motion

---

[1] In its first Complaint, VTA asserted nine causes of action.  (See Compl., ECF No. 1.)  After MTC filed its first Motion to Dismiss (ECF No. 25), VTA filed a First Amended Complaint that added a cause of breach of fiduciary duty.  (ECF No. 41.)  MTC then filed a second Motion to Dismiss.  (ECF No. 36.)  Accordingly, the court terminates as moot MTC's first motion.

in part.

## BACKGROUND

MTC is a Utah-based contractor that manages United States Job Corps centers.  (Pls.'
Opp'n, ECF No. 37 at 3.)  VTA is a California-based company that acted as a consultant for the
Los Angeles Job Corps Center ("LAJCC") when it was run by the YWCA.  (Id.; First Am.
Compl., ECF No. 41 at ¶ 14.)  Mr. Taylor, the owner of VTA, is a veteran who was disabled in
service; he is also African American.  (Id. ¶ 9.)  VTA therefore alleges that it was eligible for
certain federal procurement preferences, including set-asides for small businesses and
preferences for businesses owned by African Americans and service-disabled veterans.  (Id.
¶ 12.)  VTA also alleges that it "had substantial experience in the operation of a Job Corp[s]
Center" and was "knowledgeable about the procurement/bidding process …."  (Id. ¶ 10.)

In October 2015, the United States Department of Labor ("DOL") issued a Request for
Proposal ("RSP"), seeking a contractor to operate the LAJCC.  (Id.)  MTC was interested in
bidding on the opportunity and approached VTA about submitting a joint proposal in which
MTC would run the LAJCC as prime contractor and VTA would be awarded a subcontract to
perform specified work.  (Id. ¶¶ 11, 20.)  The parties executed a Teaming Agreement (the
"Agreement") that memorialized this relationship.  (Id. ¶ 20.)  VTA alleges that MTC sought out
the partnership because the joint proposal would make MTC's bid more competitive.  (Id. ¶ 21.)
The LAJCC had been operated by the YWCA for 50 years and VTA avers that by partnering
with a minority-owned business, MTC's bid would carry "preferences that were necessary in

order to garner more points than their competitors in the bidding process."[2]  (Id. ¶ 14.)

Under the Agreement, MTC and VTA would "prepare a competitive proposal in response to the Solicitation in a timely manner (the 'Proposal')."  (Agreement, ECF No. 1-1 at ¶ 1.1.)  And in the event that MTC was awarded the LAJCC contract, MTC would use "best efforts" to award a subcontract to VTA that would include "such terms and conditions as are appropriate to give maximum, continuing effect to all terms and conditions of the Agreement and the Proposal that reasonably might be continued post-award …."  (Id. ¶¶ 3.1, 3.2(b).)  The Agreement contained the following characterization of the parties' relationship: "Nothing in this Agreement shall be taken as constituting a partnership among the Parties, or to constitute any Party as the agent of the other Party.  Except as expressly provided in this Agreement, no Party may bind the others."  (Id. ¶ 16.)  Finally, the Agreement stated that it would terminate upon "[t]he award of the Contract to MTC and the execution of the Subcontract."  (Id. ¶ 10.1(b).)

MTC's bid was successful, although the YWCA strongly opposed the award of the contract to MTC and filed a series of protests.  (ECF No. 41 at ¶ 25–27.)  VTA alleges that it offered "material assistance" to help defeat these protests.  (Id.)  On March 18, 2019, after a three-year struggle, the MTC was finally awarded the DOL contract.  (Id. ¶ 28.)  The contract was worth $25 million per year, with a base term of two years and three subsequent one-year options.  (Id.)

On March 20, 2019, under the terms of the Agreement, MTC and VTA executed a subcontract (the "Subcontract") specifying the duties that VTA would perform as subcontractor

---

[2] MTC asserts that these preferences were not relevant to the LAJCC project and did not benefit MTC's bid.  (Def.'s Reply, ECF No. 38 at 2 n.1.)  The court finds it unnecessary to resolve this dispute for the purposes of MTC's motion and therefore takes as true the facts alleged in VTA's complaint.

to MTC for the LAJCC.  (Id. ¶ 30.)  The Subcontract constituted "the entire agreement between the parties with respect to the subject matter and supersede[d] any previous understanding, representations, commitments, or agreements, oral or written."  (Subcontract, ECF No. 1-2 at ¶ 19(a).)  The Subcontract contained the following non-solicitation provision:

> During the term of this Agreement and for a period of six (6) months following the termination or expiration of this Agreement, neither party shall knowingly solicit for hire any employees of the other party without prior written consent of the other party.  This Section does not prohibit a party's employees from responding to employment advertisements and voluntarily applying for available employment with the other party.

(Id. ¶ 6.)  Finally, the Subcontract stated that "[e]ither party may terminate this Agreement for its convenience upon sixty (60) days prior written notice."  (Id. ¶ 8(c).)

A few weeks later, in April 2019, MTC notified VTA that "pursuant to section 8(c) of the [Subcontract], MTC is expressing its intent to terminate for convenience effective June 30, 2019 at 11:59 pm Pacific Daylight time."  (ECF No. 41 at ¶ 31.)  VTA alleges it was "completely caught off guard[,]" not least because it believed that MTC could not lawfully operate the LAJCC without VTA under the terms of the DOL contract.[3]  (Id. ¶ 32.)  After an exchange with the San Francisco DOL office, VTA was "informed … that MTC could not operate the LAJCC without VTA, and that, at a minimum, MTC would be required to fill all of the critical employment positions that were to be maintained by VTA."  (Id. ¶ 34.)  VTA alleges that MTC "surreptitiously began to extend employment offers to VTA's employees, and actually secured several people to work in the LAJCC …."  (Id. ¶ 38.)

VTA served as the subcontractor at the LAJCC until June 30, 2019.  (Id. ¶ 36.)  VTA

---

[3] VTA alleges that MTC refused to communicate with MTC during May and June 2019 and has never provided VTA with a copy of the DOL contract.  (ECF No. 41 at ¶ 33.)

filed suit against MTC three years later.  (See ECF No. 1.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) requires dismissal if the complaint fails to state a claim upon which relief can be granted.  The court must accept all well-pled factual allegations as true and construe them in the light most favorable to the nonmoving party.  Strauss v. Angie's List, Inc., 951 F.3d 1263, 1267 (10th Cir. 2020).  But that rule does not apply to legal conclusions.  Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).  "Mere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."  Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "[T]o withstand a motion to dismiss, a complaint must have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).

The parties do not dispute that Utah law applies based on a choice of law provision in the Subcontract.  (See ECF No. 1-2 at ¶ 14.)  Utah courts look to the Restatement (Second) of Conflict of Laws to determine whether to apply a choice of law provision in a contract.  See Prows v. Pinpoint Retail Sys., Inc., 868 P.2d 809, 811 (Utah 1993).  And under the Restatement, "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied" except when "the chosen state has no substantial relationship to the parties or the transaction" or the "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue …."  Restatement (Second) of Conflict of Laws § 187(2) (Supp. 1988).

The parties have not argued that either of these circumstances applies.  Therefore, the court

applies Utah law.

## ANALYSIS

VTA asserts ten causes of action: 1) fraudulent inducement, 2) fraudulent nondisclosure,

3) false promise, 4) breach of fiduciary duty, 5) breach of contract, 6) breach of the implied

covenant of good faith and fair dealing, 7) promissory estoppel, 8) intentional infliction of

emotional distress, 9) unjust enrichment, and 10) declaratory relief.  MTC moves to dismiss all

but the Sixth and Tenth causes of action (and part of the Fifth cause of action).  The court will

address these claims in turn.

### I.  Fraudulent Inducement

To prove a claim of fraudulent inducement under Utah law, a plaintiff must show

> (1) that a representation was made (2) concerning a presently existing material
> fact (3) which was false and (4) which the representor either (a) knew to be false
> or (b) made recklessly, knowing that there was insufficient knowledge upon
> which to base such a representation, (5) for the purpose of inducing the other
> party to act upon it and (6) that the other party, acting reasonably and in ignorance
> of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to
> that party's injury and damage.

Daines v. Vincent, 190 P.3d 1269, 1279 (Utah 2008) (quotation omitted).

MTC contends that that VTA's fraudulent inducement claim is barred for three

reasons: 1) VTA fails to allege a false statement of material fact; 2) the claim is not pled

with sufficient particularity; and 3) the claim is barred by the economic loss doctrine.

### A.  False Statement of Material Fact and Particularity

VTA alleges that MTC made numerous promises on which VTA relied when it

joined with MTC in the bidding process and under the terms of the Agreement.  Among

others, VTA asserts that MTC claimed the parties would "win" together and "profit for

years" from the partnership, and that MTC would take steps to enhance VTA's reputation within the industry so that, either in partnership with MTC or on its own, VTA would be well positioned to win contracts for other job corps centers.  (ECF No. 41 at ¶ 44.)

The court agrees with MTC that none of these allegedly fraudulent statements is pled with sufficient particularity.  Federal Rule of Civil Procedure 9(b) requires "a plaintiff to identify the time, place, and content of each allegedly fraudulent representation or omission, to identify the particular defendant responsible for it, and to identify the consequences thereof."  Karacand v. Edwards, 53 F. Supp. 2d 1236, 1241 (D. Utah 1999) (citation omitted).  VTA fails to allege who made the representations about future work prospects or when these representations occurred.

Nevertheless, VTA points to one source of an alleged promise that is more definite: the Agreement itself.  Under the Agreement, MTC represented that it would use its "best efforts to negotiate an award" of the Subcontract in the event that MTC won the bid.  (ECF No. 1-1 at ¶ 3.1.)  Moreover, the Subcontract was to include "such terms and conditions as are appropriate to give maximum, continuing effect to all terms and conditions of this Agreement … that reasonably might be continued post-award …."  (Id. ¶ 3.2.)  The central contention of VTA's fraudulent inducement claim is that this statement was a lie because MTC never planned to continue working with VTA as envisioned in the Agreement once VTA's preferential bidding status had helped MTC win the contract.  (ECF No. 41 at ¶ 45.)

The representations made in the Agreement about the award of the Subcontract and the continuation of any terms and conditions of the Agreement that could reasonably be continued under that Subcontract demonstrate that the parties proposed and relied on

an ongoing relationship.  Taking VTA's allegations as true and construing them in the light most favorable to the Plaintiffs, the court finds that VTA has adequately alleged a false statement of material fact and has pled its fraudulent inducement claim with sufficient particularity.

### B.  Economic Loss Doctrine

MTC argues that all three of VTA's fraud claims are barred by the economic loss doctrine.  "The economic loss rule is a judicially created doctrine that marks the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care."  SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc., 28 P.3d 669, 680 (Utah 2001)  The rule "prevents recovery of economic damages under a theory of tort liability when a contract covers the subject matter of the dispute."  Reighard v. Yates, 285 P.3d 1168, 1174 (Utah 2012).

To determine whether the economic loss rule bars a claim, the court must consider "whether a duty exists independent of any contractual obligations between the parties." Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC, 221 P.3d 234, 244 (Utah 2009) (quotation omitted).  The economic loss rule will not bar a tort claim that is based on a legal duty independent of the duties set forth in the contract.  Id.  But "[i]f the tort alleges a breach of a duty that the contract itself imposes, then the claim is barred; the plaintiff can sue only for contract-based remedies."  KTM Health Care Inc. v. SG Nursing Home LLC, 436 P.3d 151, 170 (Utah Ct. App. 2018).

Application of the independent duty doctrine is especially challenging for fraudulent inducement claims because "'[f]raudulent inducement' combines both contract and tort law

concepts and is thus at the juncture point of contract and tort law."  48 Am. Jur. Proof of Facts 3d

329 § 1.  It is therefore unsurprising that courts have not ruled uniformly when confronted with

the task of applying the contract-tort boundary of the economic loss rule to the mix of contract

and tort law in fraudulent inducement claims.

  Under one theory, a claim for fraudulent inducement always invokes an independent duty

not covered by requirements of the contract.  In an older case from this district, the Honorable

Dee Benson held that "[a] claim for fraud in the inducement cannot be barred by the economic

loss doctrine.  This is true because … the doctrine only applies to bar tort claims that fall within

the 'bargained-for duties and liabilities' of a contract."  <u>Associated Diving & Marine</u>

<u>Contractors, L.C. v. Granite Constr. Co.</u>, No. 2:01-cv-330-DB, 2003 WL 25424908, at *7 (D.

Utah July 11, 2003) (quoting <u>Grynberg v. Questar Pipeline Co.</u>, 70 P.3d 1, 11 (Utah 2003)).  The

Tenth Circuit, interpreting Colorado law, explained the distinction as follows:

> Where a negligence claim is based only on breach of a contractual duty, the law
> of contract rightly does not punish the breaching party, but limits the breaching
> party's liability to damages that naturally flow from the breach.  It is an altogether
> different situation where it <u>appears</u> two parties have in good faith entered into a
> contract but, in actuality, one party has deliberately made material false
> representations of a past or present fact, has intentionally failed to disclose a
> material past or present fact, or has negligently given false information with
> knowledge that the other party would act in reliance on that information in a
> business transaction with a third party.  The breaching party in this latter situation
> also is a tortfeasor and may not utilize the law of contract to shield liability in tort
> for the party's deliberate or negligent misrepresentations.

<u>United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.</u>, 210 F.3d 1207, 1227 (10th Cir. 2000).

  But more recently, the Utah Supreme Court disagreed with this rationale when asked to

consider whether the economic loss rule extended to the tort of fraudulent inducement.  <u>See</u>

<u>HealthBank Int'l, LLC v. Synergy Worldwide, Inc.</u>, 435 P.3d 193 (Utah 2018).  The Court held

that "the Utah economic loss rule applies to a fraudulent inducement claim that is duplicative of

a breach of a contract claim." Id. at 196.  In making this holding, the Court expressly disavowed the statement of the Colorado Supreme Court that "there is an important distinction between failure to perform the contract itself, and promises that induce a party to enter into a contract in the first place." Id. at 197 (quoting Van Rees v. Unleaded Software, Inc., 373 P.3d 603, 607 (Colo. 2016)).  The Court held instead that "[w]hen the subject matter of the inducing promises [is] later negotiated for and included in the contract, the distinction [referred to by the Colorado Supreme Court] is illusory." Id.  The Court continued:

> Contracts are negotiated first and drafted second.  To claim that a promise is independent of a contract simply because it was spoken prior to the formation of a contract would open the door to tort liability for all pre-contractual negotiations that were eventually enshrined in a contract.  This exception would swallow the rule.  And we decline to endorse such an exception.

Id.

Nevertheless, the Court chose to answer "a narrower question than the one certified by the district court," id. at 196, thereby leaving open "the possibility of a fraudulent inducement exception in some other circumstance." Id. at 198.  In a subsequent decision from this district, the Honorable Clark Waddoups held that a fraudulent inducement claim was not barred by the economic loss doctrine because the fraudulent inducement claim related to a series of notes and confessions of judgments that were related but distinct from the agreement that served as the basis for the breach of contract claim.  Ennis v. Alder Protection Holdings, LLC, No. 2:19-cv-512-CW, 2021 WL 409785, at *6–7 (D. Utah Feb. 5, 2021).  Citing a Utah Court of Appeals decision issued after HealthBanc, see KTM Health Care, 436 P.3d 151, the court ruled that Utah courts would likely find an "independent duty on a speaker to tell the whole truth" in these circumstances.  Ennis, 2021 WL 409785, at *11.

The present case raises a novel question that is not directly on all fours with either

HealthBanc or Ennis.  Unlike the claims in Ennis, VTA's fraudulent inducement claims relate to the same conduct as its breach of contract claims—namely, MTC's allegedly bad faith termination of the Subcontract.  But as discussed below (and as MTC argues), VTA's claim for breach of the express terms of the Subcontract's termination provision fails because MTC complied with those express terms.  Instead, VTA must proceed on its theory that MTC breached the implied covenant of good faith and fair dealing, a claim that requires the court to look beyond the express contract terms alone:

> To comply with his obligation to perform a contract in good faith, a party's actions must be consistent with the agreed common purpose and the justified expectations of the other party.  The purpose, intentions, and expectations of the parties should be determined by considering the contract language and the course of dealings between and conduct of the parties.

St. Benedict's Dev. Co. v. St. Benedict's Hosp., 811 P.2d 194, 200 (Utah 1991) (citation omitted).  The court must therefore decide whether the Utah Supreme Court's ruling in HealthBanc extends to circumstances where the fraudulent inducement claim only relates to a claim for a breach of the implied covenant of good faith and fair dealing, and not to a claim for breach of the express terms of the contract.

The court finds it does not.  MTC's duty to perform the Subcontract in good faith is a duty that is related to the contract but independent of the express terms of the contract.  In contrast, the counterclaimant's fraudulent inducement claim in HealthBanc "overlap[ped] completely" with its breach of contract claim "in the sense that the alleged fraudulent inducement [wa]s also a breach of a warranty" that was guaranteed by the express terms of the contract.  See HealthBanc, 435 P.3d at 196.  Here, MTC implicitly argues that there is no overlap because the Subcontract contains no provisions enshrining the alleged representations MTC made about an ongoing relationship between the parties.  Because the duty to act in good faith

(synonymous here with the duty to "tell the whole truth" prior to contract formation) is sufficiently independent of MTC's express contractual obligations, the court finds that the economic loss rule does not act as a bar to VTA's fraudulent inducement claim.

Although VTA may not recover under both its fraudulent inducement claim and its claim for the breach of the implied covenant of good faith and fair dealing, it may proceed on these claims as alternative theories of liability.  See KTM Heath Care, 436 P.3d at 169 ("Rule 8(e) [of the Utah Rules of Civil Procedure] permits [a plaintiff] to pursue inconsistent theories at trial (i.e., breach of contract and fraudulent inducement), and [the plaintiff] should not have … to elect its remedy until after the jury return[s] a verdict on those theories.").

For these reasons, the court denies MTC's motion to dismiss VTA's fraudulent inducement claim.

## II. Fraudulent Concealment or Fraudulent Nondisclosure

To prevail on a claim for fraudulent nondisclosure, "a plaintiff must prove by clear and convincing evidence that (1) the defendant had a legal duty to communicate information, (2) the defendant knew of the information he failed to disclose, and (3) the nondisclosed information was material."  Anderson v. Kriser, 266 P.3d 819, 823 (Utah 2011) (quotation omitted).  The elements for fraudulent nondisclosure and fraudulent concealment are the same.  See id. at 823 n.11 ("We recognize that in Utah the elements for fraudulent nondisclosure are essentially the same for fraudulent concealment.").

MTC argues that it did not have a legal duty to communicate information to VTA because the parties were involved in arm's-length negotiations and because VTA has failed to plead the existence of a joint venture between the parties.  The court agrees.  VTA and MTC are both businesses involved in an arm's-length transaction in which there is generally no duty to

disclose information.  See Hussein v. UBS Bank USA, 446 P.3d 96, 103 (Utah Ct. App. 2019)

("Whether a duty to disclose certain material facts exists is determinable by reference to all the

circumstances of the case.…  But such a duty will not be found where the parties deal at arm's

length, and where the underlying facts are reasonably within the knowledge of both parties."

(quotation omitted)).

Furthermore, VTA has not adequately pled the existence of a joint venture between VTA

and MTC.  To establish a joint venture under Utah law,

> [a]s a general rule, there must be [1] a community of interest in the performance
> of the common purpose, [2] a joint proprietary interest in the subject matter, [3] a
> mutual right to control, [4] a right to share in the profits, and [5] unless there is an
> agreement to the contrary, a duty to share in any losses which may be sustained.

Ellsworth Paulsen Constr. Co. v. 51-SPR-L.L.C., 183 P.3d 248, 252 (Utah 2008).

While VTA has demonstrated a "community of interest in the performance of the

common purpose," see, e.g., ECF No. 1-1 at 2 (stating that the parties would "join together as a

team" to provide a competitive bid), it has not shown any of the remaining four elements.

Neither the Agreement nor the Subcontract provide for a mutual right to control, to share in the

profits, or a duty to share in any losses.  Indeed, the Agreement states that the bid submission

will be in each party's "own commercial interests" and includes the following provision:

"Nothing in this Agreement shall be taken as constituting a partnership among the Parties, or to

constitute any Party as the agent of the other Party.  Except as expressly provided in this

Agreement, no Party may bind the others."  (ECF No. 1-1 at ¶¶ 1.10, 16.)

Because VTA has not shown the existence of a joint venture or pleaded facts to establish

any other special relationship, it has not demonstrated that MTC owed VTA a legal duty to

disclose.  Accordingly, VTA's claim for fraudulent nondisclosure fails and the court need not

consider whether the claim is further barred by the economic loss doctrine.  The court dismisses

this claim with prejudice.

### III.  False Promise and False Statement of Future Performance

VTA asserts a claim for false promise and false statement of future performance that is nearly identical to its claim for fraudulent inducement.  (Compare ECF No. 41 at ¶¶ 43–52, with id. ¶¶ 62–71.)  MTC argues that there is no Utah case that specifically recognizes a claim of "false promise," although the state has "long recognized as actionable deceit a promise accompanied by the present intention not to perform it, made for the purpose of the promissee, thereby inducing him to act where otherwise he would not have done so, and by virtue of which he parts with his money or property."  Cerritos Trucking Co. v. Utah Venture No. 1, 645 P.2d 608, 611 (Utah 1982) (citation omitted).  While this holding demonstrates that making a promise with a present intent not to fulfill it may support a general fraud claim, it does not support the proposition that either false promise or false statement of future performance in an independent, recognized cause of action in Utah.  See Gaddy v. Corp. of Pres. of Church of Jesus Christ of Latter-Day Saints, No. 2:19-cv-554-RJS, 2023 WL 2665894, at *22 & n.273 (D. Utah Mar. 28, 2023) (noting that Cerritos describes "breach of a promise of future performance in the context of general fraud claims" and finding no independent cause of action for "constructive fraud based on a breach of promises of future performance").

Because the court finds that this claim is duplicative of the Plaintiffs' claim for fraudulent inducement, this claim is dismissed with prejudice.

### IV.  Breach of Fiduciary Duty

To state a claim of breach of fiduciary duty, VTA must show "the existence of a fiduciary relationship (such as attorney-client, physician-patient, or insurer-insured); breach of the fiduciary duty; causation, both actual and proximate; and damages."  Gables at Sterling Village

Homeowners Assoc., Inc. v. Castlewood-Sterling Village I, LLC, 417 P.3d 95, 109 (Utah 2018). For the reasons stated above, the court has found that no joint venture existed between VTA and MTC.  And VTA has not demonstrated the existence of any other fiduciary relationship.

VTA argues that "MTC had far more resources, sophistication, and experience in the operation of Job Corps centers …."  (ECF No. 37 at 17.)  But VTA was also a sophisticated party, chosen for its knowledge and skills.  (See ECF No. 41 at ¶ 10 ("Plaintiffs had substantial experience in the operation of a Job Corp[s] Center [and] were knowledgeable about the procurement/bidding process ….").)  The court finds there was no fiduciary relationship and, therefore, that VTA cannot state a claim for breach of fiduciary duty.  The court dismisses this claim with prejudice.

## V.  Breach of Contract

MTC asserts that VTA's breach of contract claim should be dismissed to the extent it is premised on a violation of the Agreement or the termination clause of the Subcontract.  The court agrees.

The Agreement states that it will terminate upon "[t]he award of the Contract to MTC and the execution of the Subcontract."  (ECF No. 1-1 at ¶ 10.1(b).)  And although certain provisions of the Agreement "survive the termination or expiration of this Agreement" (id. ¶ 1.9; see also id. ¶¶ 6.5, 9), the execution of the Subcontract superseded these provisions: "This [Subcontract] constitutes the entire agreement between the parties with respect to the subject matter and supersedes any previous understanding, representations, commitments, or agreements, oral or written."  (ECF No. 1-2 at ¶ 19(a).)  Therefore, at the time VTA alleges MTC breached the contract, the Subcontract was the only operative agreement between the two parties.  Although the Agreement provides evidence of the parties' understanding of the provisions in the

Subcontract, the Agreement itself was unenforceable at the time of the alleged breach.  Cf. Centennial Inv. Co., LLC v. Nuttall, 171 P.3d 458, 460–61 (Utah Ct. App. 2007) (granting summary judgment on a breach of contract claim where the contract was unenforceable).

The court also agrees with MTC that VTA has not pled facts demonstrating a breach of the express terms of the Subcontract's termination provision.  That provision states: "Either party may terminate this Agreement for its convenience upon sixty (60) days prior written notice." (ECF No. 1-2 at ¶ 8(c).)  VTA does not allege that MTC failed to give the adequate prior written notice.  Instead, VTA asserts that MTC's invocation of the termination provision within weeks after signing the Subcontract was a violation of the implied covenant of good faith and fair dealing.  The Plaintiffs have separately alleged a breach of that implied covenant and MTC does not move to dismiss that claim.  But the court treats this allegation as distinct from a claim that MTC breached the express terms of the Subcontract.  See St. Benedict's, 811 P.2d at 199 (stating that a trial court should treat a claim a breach of the implied covenant of good faith and fair dealing "separately from the other breach of contract claims").

VTA argues that an interpretation of the termination clause that gives MTC an unfettered right to terminate would render the contract illusory: "It is hornbook law … that a route of complete escape vitiates any other consideration furnished and is incompatible with the existence of a contract."  Torncello v. United States, 681 F.2d 756, 769 (Ct. Cl. 1982).  But Utah courts have recognized that a party's right to terminate a contract is "circumscribed by the requirement that it exercise it in good faith …."  Res. Mgmt. Co. v. Weston Ranch & Livestock Co., Inc., 706 P.2d 1028, 1037 (Utah 1985).  VTA's argument about how the court should interpret the termination clause supports its claim for breach of the covenant of good faith and fair dealing,

but it does not support a claim for breach of the express terms of the contract.

The court dismisses VTA's breach of contract claim only in part. VTA has separately alleged (see ECF No. 41 at ¶ 88) that MTC breached the non-solicitation provision of the Subcontract, which directs that "neither party shall knowingly solicit for hire any employees of the other party without prior written consent of the other party" for a period of at least six months after termination of the Subcontract. (ECF No. 1-2 at ¶ 6.)

VTA may continue to assert a claim for breach of contract against MTC under the non-solicitation provision. But VTA's breach of contract claim is dismissed with prejudice to the extent that VTA is asserting a breach of the express terms of the Agreement or the termination provision of the Subcontract.

## VI. Promissory Estoppel, Intentional Infliction of Emotional Distress, and Unjust Enrichment

VTA did not contest MTC's motion to dismiss its causes of action for promissory estoppel, intentional infliction of emotional distress, or unjust enrichment, either in its opposition to the Defendant's motion (see ECF No. 37) or during the hearing the court held on the motion. Accordingly, the court dismisses these three causes of action with prejudice.

## ORDER

The court ORDERS as follows:

1.      The Defendant's Motion to Dismiss (ECF No. 36) is GRANTED IN PART and DENIED IN PART.

2.      The motion is GRANTED on the Plaintiffs' Second, Third, Fourth, Seventh, Eighth, and Ninth causes of action.

3.      The motion is DENIED on the Plaintiffs' First cause of action for fraudulent inducement.

4.      The motion is GRANTED IN PART on the Plaintiffs' Fifth cause of action for breach of contract.  This claim is dismissed to the extent it is premised on a breach of the express terms of the Agreement or the termination provision of the Subcontract.  The Plaintiffs may continue to assert a breach of contract claim against the Defendant for breach of the non-solicitation provision of the Subcontract.

5.      The Defendant's previous Motion to Dismiss (ECF No. 25) is TERMINATED AS MOOT.

DATED this 29th day of September, 2023.

BY THE COURT:

Tena Campbell
United States District Judge